Fellows v. Heermans.

---

JOSEPH FELLOWS, Appellant, v. JOHN HEERMANS, Respondent.

(GENERAL TERM, THIRD DEPARTMENT, DECEMBER, 1870).

A conveyance of all his real and personal estate, on account of the grantor's age and infirmities, and in consideration of one dollar, with a proviso that the grantee shall sell and convey the lands at retail, and that the avails shall be paid over to the grantor during his life, and afterward applied to pay debts and expenses of the trust, and the residue distributed as directed in a subsequent instrument to be executed by the grantor; or in default of such instrument to the grantor's heirs, though void as an express trust, confers, it seems, a valid power in trust, and is irrevocable, although the subsequent instrument provided for is not executed. (MILLER, P. J., dissenting.)

The plaintiff conveyed his real and personal estate, for a specified consideration, with direction to sell by retail, with warranty; and until sale to rent the land, also to collect the grantor's debts, and to pay and distribute the avails of the real and personal estates. First, to defray expenses. Second, to pay the grantor, or appropriate to his use, during life, the residue of all moneys received. Third, after the grantor's decease, to distribute the residue, among certain persons, as directed, by a supplementary writing (also executed), or in default thereof, to his heirs. It seems that if the provision, with regard to sale of the land, was inopera-

Fellows *v.* Heermans.

tive as a trust, the provision for renting the land, and applying the avails, would, nevertheless, stand as a valid trust to receive the rents and profits of land, &c., under sub. 3, of § 55, 1 R. S., 728; and that this was so, notwithstanding the main purpose of the conveyance might be the sale of the land, and the provision for leasing but subsidiary and subordinate thereto. *Id.*

And *held,* that the conveyance contained a valid power in trust. *Id.*

Where a trust is intended by a conveyance of land, but fails entirely, so that the grantee takes no estate in the land under the conveyance, it may, nevertheless, create in him a valid power in trust. *Id.*

*Held* further, that the conveyance created a valid trust in personal property, and that it conferred upon the trustee power to collect principal and interest of securities, and dividends on stock, and of reinvestment of money, or assignment of securities. *Id.*

Parties must be held to have comprehended the legal effect of the instrument they have executed. A mere misconception of the law as an abstract proposition, not entering as an ingredient into the transaction, is not sufficient to confer a power of revocation, or to entitle the party who claims to be aggrieved to relief.

APPEAL by plaintiff from judgment at special term, dismissing the complaint, with costs, in an action brought to set aside three several instruments, in writing, executed by plaintiff to defendant, dated respectively, the 3d, 10th, and 15th days of October, 1868. The facts are sufficiently stated in the opinion.

*George B. Bradley* and *L. D. Rumsey,* for the appellant.

*G. F. Spencer,* for the respondent.

Present—MILLER, P. J., HOGEBOOM and PARKER, JJ.

By the Court—HOGEBOOM, J. This is an appeal by the plaintiff from a judgment at Special Term, dismissing the complaint in this action. The object of the suit was to set aside three several deeds (or instrument purporting on their face to be such) by the plaintiff to the defendant of all the plaintiff's real and personal property for certain purposes therein declared, or more correctly speaking, two of them purporting to be such deeds, and the third purporting to make a distri-

bution of the proceeds of the rents and sales realized under the second, so far as they were not disposed of by the plaintiff himself. These deeds are severally dated on the 3d, 10th and 15th of October, 1868. The grounds upon which they were sought to be set aside, and which are, more or less, distinctly presented in the complaint and subsequent proceedings, are substantially, as follows:

1. That the deeds themselves were neither absolute conveyances nor valid conveyances in trust, but mere powers of attorney, and revocable in their nature ; and, in fact, revoked by the grantor.

2. That at all events the plaintiff supposed them to be so, and was encouraged, or, at least, not undeceived in that belief by the defendant; and having acted under an uncorrected misapprehension of their legal effect, was entitled to relief against them ; and, in fact, to have them revoked and annulled.

3. That the defendant, in addition to the non-disclosure by him to the plaintiff of the true legal character and effect of the conveyances, practiced undue influence and positive fraud upon the plaintiff, in procuring their execution.

These grounds of relief will be severally examined ; and in doing so, the questions considered. 1. How far the plaintiff is entitled to relief upon the face of the instruments themselves; and, 2, upon extrinsic facts. To determine these questions it will be necessary to examine, critically, the contents of these instruments.

The first is dated on the 3d day of October, 1868 ; and after reciting that the plaintiff, from his infirmities and advanced age, deemed it expedient to convey to his nephew, the defendant, all his property, proceeds in consideration of the premises, and of one dollar to grant and convey to the defendant, his heirs and assigns, all his real and personal estates, by general words of description, with a proviso that he should sell the lands, by retail, for the best prices obtainable, and convey the same, in fee simple, to the purchasers, with covenants, binding his heirs to warrant and defend the

same; and further directing that the avails of the said real and personal estate should be paid and distributed, as follows: 1st. To pay over to the grantor, during his life, all moneys received.

2d. Afterward to apply the same, first, to the payment of his just and legal debts and the expenses of the trust, and then to distribute the residue as directed in a subsequent writing to be executed by the plaintiff, or, in default thereof, to his heirs.

The second instrument, which seems to have been executed to supply a supposed defect in the first, and, mainly, an omission to provide for the disposition of the rents and profits of the real estate until sold (the first instrument having been canceled, or attempted to be, by the grantor, and his signature thereto erased), bears date on the 10th day of October, 1868, and is substantially similar to that of the 3d of October, except that it contains this clause: "And until the said lands shall be sold as aforesaid, he shall rent such of them as can be rented for the best prices that can be got;" and except, also, that, after providing that the avails of the property should be paid and distributed, first, to defray the expenses of the trust, he provides, secondly, that, during his life, " the residue of all moneys received shall be paid over to me, *or appropriated to my uses, under my direction.*"

The third instrument bears date the 15th day of October, 1868, and seems to have been executed simply as the supplementary paper for distribution provided for in the deed of the 10th of October. It refers to the paper of the 10th by its date; recites the substance of its provisions; declares this to be executed as supplementary to that, and explanatory of his intention thereby; and then proceeds to direct the defendant, describing him as "trustee as aforesaid," "to distribute the aforesaid moneys and property," first, to the payment of certain annuities (specifying them); secondly, to convey certain specific portions of real estate to particular persons; and, thirdly, to divide the residue of the avails among certain nephews and nieces (naming them).

Fellows *v.* Heermans.

These are the provisions of the said instruments; and it will be necessary to examine each of them.

The deed of the 3d of October, though attempted to be canceled, probably could not be, even with the consent of both parties to the instrument, unless it was, in legal effect, a power of attorney, and revocable in its character. For the grantor and the grantee were not the only persons interested in its provisions. The beneficiaries under it had, I think, a vested interest; and, although they have not yet been named (for the paper of the 15th of October seems to be simply in execution of that of the 10th), I think they still may be, if the instrument of the 3d of October confers a valid trust, or a valid power in trust. And such a supplementary paper, inasmuch as no time is limited for its execution, will, as it seems to me, be, in such event, a valid execution of the power of distribution therein reserved. It will be necessary, therefore, to consider the question, whether it contains a valid trust, or valid power in trust. This question is one of some interest in the case, and, I think, calls for a decision, although it is undeniable that it has not such clear and definite characteristics as the subsequent instrument of October 10th.

As an *express* trust, I incline to think the instrument is *void*, for it is neither a trust.

1. To sell lands for the benefit of creditors; nor,

2. To sell lands for the benefit of legatees; nor,

3d. To receive (*expressly*) the rents and profits of lands, and apply them to the use of a person for life, or for any shorter time (although I do not see why a conveyance of the lands, with directions to sell and pay over the avails, does not carry with it an *implied* power to receive the rents until an actual sale); nor,

4. To receive the rents and accumulate the same. (1 R. S., 729; 3 R. S., 5th ed., 16, § 55.)

But I am inclined to think it confers a valid power in trust, for it is a power to sell lands which the grantor might lawfully perform (1 R. S., 732, § 94,) [74]; and a *general* power authorizing the alienation, in fee, to any person whomsoever

(§ 96,) [77] ; and a general power *in trust*, because the grantor, or after his death, third persons are designated, as entitled to the proceeds resulting from the alienation of the lands. (1 R. S., 734, § 114,) [94.]

This aspect of the case has not been particularly discussed ; but such are my views, without the benefit of an argument of the question.

But whatever doubts may exist as to the character of the paper of the 3d of October, that of the 10th seems to be reasonably clear as to its true construction and legal effect. It contains, in the first place, a conveyance for a specified consideration of the property to the defendant ; next a direction or provision for the grantee to sell the same, by retail, with covenants of warranty ; and, until sale, to rent the real estate, so far as practicable, for the best prices obtainable ; next a direction to collect his debts ; and, lastly, a provision to pay and distribute the avails of the real and personal estates : First, to defray the expenses of the *trust*. Secondly, to pay to the grantor, during his life, or appropriate to his use, under his direction, the residue of *all moneys received*. Thirdly, after his decease, and the payment of his debts and the expenses of the trust, to distribute the residue, as directed in a supplementary writing, to be thereafter executed ; or, in default of such writing, to his heirs.

A supplementary writing referring to the paper of the 10th of October, and in strict accordance therewith, is found in the paper of the 15th of October, 1868.

It is not, as I understand, denied that the deed of the 10th of October, so far as it directs, the receipt of the rents and profits of the lands, and their application to the use of the grantor during his life, or the shorter term which should intervene before a sale of the real estate would, if it stood alone, without other provisions in the deed, constitute a valid trust within subdivision 3, of section 55, of the article in the Revised Statutes on uses and trusts. (1 Rev. Stat., 729.)

The doubt which was once entertained whether a trust " to pay over " was equivalent to a trust " to apply to the use of ; "

and whether the *cestui que trust* could be the grantor or creator of the trust himself no longer exists, being removed by express adjudication. (*Leggett* v. *Perkins*, 2 Comst., 297; *Matter of Livingston*, 34 N. Y., 555.)

But I understand it to be claimed, first, that the provision, as to the rents and profits, is not the main, but only a subordinate purpose of the grant, and, secondly, that there is not a suspense of the power of alienation which is deemed indispensable to constitute a valid trust.

As to the first objection, it is not quite certain (though I admit it is probable) that sales, and not leases, were the chief objects of the grantor. We have no adequate means of determining how rapidly advantageous sales of the plaintiff's property had theretofore, or could be thereafter, effected, or whether the resources arising from rents would or would not exceed those arising from sales during the comparatively brief period to which the plaintiff's life could possibly be protracted. But I think it no sound argument against the application of the law of trusts to the clause disposing of the rents and profits, that the clause in regard to sales was (if it was) inoperative as a trust. The two clauses are not, in their nature, inconsistent, but entirely harmonious; and if both cannot stand as trusts, or trust powers, it is no new thing that parts of an instrument are sustained as valid, while other portions are condemned as inoperative and ineffectual. To sustain the one, and overthrow the other, would not seem to me to be so utterly subversive of the general scheme or purpose of the grantor as to require it to be done; and, hence, if we were obliged to regard the provision for renting or leasing the property until a sale, or until the plaintiff's decease, as probably entirely subsidiary and subordinate to the other, I should not feel compelled to erase from the deed this provision for the temporary disposition of the property.

Again, it is said there is no valid trust, because no suspense of the power of alienation. There being a direction to sell and alienate the lands, there could not be, it is argued, a suspense of the power of alienation. In my opinion, such a

suspense of the power of alienation is not necessary to constitute a valid trust.  Of course, if the exercise of the power of alienation is inconsistent with the purposes of the trust, it is void, or must be regarded as suspended, but only because it is in contravention of the trust; and such a sale is, by the statute, void.  (1 R. S., 730, § 84 [§ 63.])  So the right of the beneficiaries in the rents and profits is inalienable.  (1 R. S., 730 [§ 63.])  But that does not make the lands themselves inalienable.  On the contrary, the purpose is ultimate alienation and temporary renting of the lands.  Upon alienation and distribution of the avails, the trust ceases.  Until alienation, the trust continues; and any sale or act inconsistent with the trust is void.  But alienation is not inconsistent with the previous existence of the trust, though it is destructive of its further continuance.  A trust to sell lands for the benefit of creditors, or of legatees, is authorized, being directly within the words of the statute (§ 55); and yet, the power of alienation is not suspended, except for the period preceding the exercise of the power of sale, during which it cannot, of course, be exerted in contravention of the trust.  The doubt which has arisen on this subject is probably, in a great measure, due to the fact that the cases which have come up for examination were those where the purposes of the trust could not be accomplished without a suspense of the power of alienation.  Here, the case is different.  Alienation is authorized by the terms of the deed; and the previous suspense, carried to its furthest extent, to wit, for one life, is palpably within the limitation allowed by the statute.  (*Belmont* v. *O'Brien*, 12 N. Y., 394.)

But if it should be held that the instrument in question does not create a valid trust, then, it seems to me, there is a valid power in trust; and such an instrument is equally incapable of revocation.  It is a valid power in trust, because it calls for the execution of a power which the grantor possessed, to wit, the alienation of his property, without restriction as to the persons who should be alienees for certain designated purposes, to wit, for distribution of the avails to the grantor as to such moneys as should be received during his life, and to

Fellows *v.* Heermans.

certain other beneficiaries specifically named after his death; and, at all events, of a power to receive the rents and profits of lands; pay them, when received, to the grantor during his life, or apply them to his use; and, after his death, to distribute them, after the payment of debts and expenses, among certain specified persons. This seems to me to be within the statutory definition of a valid general power in trust. (1 R. S., 732, 734 [§§ 74, 77, 94.]) And this trust power is imperative. Its performance may be compelled for the benefit of the parties interested therein; and, although the title remains in the grantor, it so remains "subject to the execution of the trust as a power." (1 R. S., 729 [§ 59]; id., 734 [§ 96]; *Selden* v. *Vermilyea*, 1 Barb., 58; *Arnold* v. *Gilbert*, 5 id., 190.)

It is argued that there is no valid power in trust, because a power must either be granted by a clause in a last will and testament, or by a clause in a conveyance of some estate in the lands to which the power relates. (1 R. S., 735, § 106.) And that as the trust is void, the attempted conveyance does not take effect, and is not valid as a trust deed; and hence the *title* remains in the granter; and, therefore, it does not come within the definition above quoted, and is not contained in a *conveyance* of some *estate* in the lands. But we are not permitted to overlook the other section of the statute which expressly declares that the attempted trust, failing to take effect as such, by reason of not coming within the enumerated classes; and, therefore, passing no estate to the trustees *shall be valid* as a power in trust of directing or authorizing the performance of an act which may be lawfully performed under a power. (1 R. S., 729, § 58.) These two sections must both have effect, and must be construed accordingly. The section declaring the instruments in which a power might be contained, was *general*; and the other must be regarded, *if necessary*, as an exception to the general rule. But the conveyance is, in fact, of the *nature* of the conveyances specified in the statute; though, for a *particular reason*, it is not permitted to take effect as a *transfer of title*. Nevertheless, it is, in form, a conveyance of lands and for certain

Fellows v. Heermans.

purposes, to wit, for the purpose of the power, a valid instrument. Unless we so construe the statute, there *never* can be a valid *power* or trust, where a trust estate is attempted to be created, but fails for the reason before mentioned, except in cases where there are other indisputable trusts passing the estate in the instrument besides the one whose validity is in question. This could not have been the intention of the law makers. If section [58] had immediately succeeded section [106] in the statute, I do not think there would have been a moment's hesitation as to the proper construction. And I think, as they now stand, they should be read together, and as reflecting mutual light on each other.

There is also, I think, a valid trust in regard to the personal property. The Revised Statutes do not apply to trusts of personal property, except as to future and contingent interests therein, and except that the absolute ownership of personal property shall not be suspended for a longer period than the continuance of two lives in being at the creation of the trust. (1 R. S., 773, §§ 1, 2; *Kane* v. *Gott*, 24 Wend., 641; *Brown* v. *Harris*, 25 Barb., 134.)

Here is, plainly, no illegal suspense of ownership; and, as to the personal property, so far, at least, as it existed in money or was converted into money by the collection of debts, it seems to me, the disposition of the personal property was lawful and irrevocable. Whether the whole estate, real and personal, being directed to be sold and converted into money, should not be regarded, upon the principle of equitable conversion, as money, is a question which has not been, to any extent, discussed, and is not, perhaps, absolutely necessary to be now determined. It seems to me, however, that if, as it is claimed, the obvious purport of this instrument was to have all the grantor's property converted into money with all reasonable dispatch, we may properly treat it as money for the purpose of construing the trust. "Courts of equity often regard things agreed or ordered to be done as actually performed. And as the testator has, in effect, directed all his

personal to be converted into real property, we may regard the conversion as made, for all the purposes of passing upon the validity of the trust." (*Hawley* v. *James*, 16 Wend., 149.) "No principle is better established than this, that those who take the beneficial ownership of property under a will, take it in the character which the testator has thought proper to impart to it. If he gives property to be laid out in land, then it vests as land. If land is devised to be sold and the proceeds are given over, it becomes personalty, and vests and passes as such." "The principle on which the doctrine of conversion rests is, that whatever in a will or other instrument is directed or agreed to be done is in equity considered as actually performed. (*Craig* v. *Leslie*, 3 Wheat., 563; *Kane* v. *Gott*, 24 Wend., 660.)" "If the direction is imperative, requiring a sale at all events, and leaving it discretionary only as to the time and manner of selling, then the sale, when made, has the same effect in respect to the rights of parties in interest as though made immediately. (Leigh & Dalzell, 48; *Casamajor* v. *Strode*, cited in note, 19 Ves., 390.)" (*Arnold* v. *Gilbert*, 5 Barb., 196, 197.)

It is said that the provisions for turning this property into money are imperfect and indefinite; that there is no provision for collecting the principal or interest of securities, or of dividends on stock, or for reinvestment of money or assignment of securities, or for sales of stock or securities. I think otherwise, and think all these powers are covered by the direction to make sales, and give deeds, and collect debts, and convert into money. It is not necessary that all the details should be severally specified, item by item. They seem to me to be embraced in the powers actually conferred and specifically enumerated. Hence, it seems to me, that, if necessary to resort to this construction, the instrument may be sustained, as a valid trust of personal property, and capable of enforcement as such.

I regard, therefore, the instruments in question, not as mere powers of attorney, and revocable by the principal, but as creating valid and irrevocable trusts, or powers in trust.

An important question in regard to them remains to be discussed, which occasionally arises, and is of considerable interest; and that is, whether the plaintiff misunderstood or misapprehended their real character and legal effect, and whether he was, in any degree, encouraged in this belief by the defendant, and whether, for either or both of these reasons, he is entitled to have them revoked or reformed.

There is apt to arise in the mind, I think, a strong disposition to afford the party relief, under such circumstances, because the property was wholly his own, the disposition of it substantially voluntary and gratuitous (whether so, legally speaking, or not), and, in this case, the persons provided for not those who had any absolute claim on his bounty by reason of being his offspring. But, nevertheless, the law must be administered upon certain permanent and established rules; and legal instruments, in their very nature, have a certain solemnity and importance which should forbid their being executed except upon the theory that they are to have efficacy and effect.

The instruments in question are supported by a sufficient legal consideration. They acknowledge the receipt of one dollar as a pecuniary consideration. They recite sufficient reasons and inducements for their execution on the part of the grantor; and the acceptance of them by the grantor, carries with it an obligation to perform the services therein required, and to appropriate the moneys and property as therein directed.

It is now claimed that there was a misconception, on the part of the plaintiff, as to their legal effect. This fact is substantially found by the justice who decided the cause. It is not claimed, as I understand it, that this idea was ever present to his mind at the time the papers were drawn or executed, or that it influenced his action, in any way whatever, or that the papers, as executed, did not fully express his wishes and instructions at the time, or that he would have made any different disposition of his property at the moment, as to the persons who were to participate in it, if he had known or

considered the fact that the provisions were irrevocable. Nor
is there, in my opinion, any just reason to believe that the
defendant mislead him on this point, or made any effort to
impress on his mind the idea that the papers were subject to
subsequent revocation or modification by the grantor; or
even that the defendant had any reason to know, or believe,
that the plaintiff was not fully cognizant of their legal import
and effect. Nor is there any ground of mutual mistake,
either of fact, or of law, upon which the plaintiff can base
any claim to relief. It is not the case of the execution by a
party of an instrument whose contents he did not understand,
or whose effect, both as to the persons who were to share in
his property, and the quantity of interest they were, respect-
ively, to take, he did not fully comprehend. It is simply that
the plaintiff's impressions of the law, at the time of giving
his testimony, and at the time of executing these papers,
were, that instruments of this character were, in their nature,
revocable. These impressions had no practical effect upon
his action at the time, and were not a matter of consciousness
when the papers were executed; and, I think, cannot, there-
fore, be said to have entered into the transaction as a part of
it. All that can be said about it is that his notions of law
were imperfect; and if that were a sufficient ground of relief,
who of us could execute a legal instrument. Men must
know the law, and we must administer justice, and give effect
to legal instruments upon the presumption that they do. The
courts have over and over again declared the legal effect of
testamentary papers, and pronounced certain dispositions of
land, to confer a mere life estate therein, notwithstanding the
evidence was morally conclusive that the testator supposed
he was conferring a fee simple absolute. And, I think, the
decision of the courts would have been the same (assuming
the cases to be unembarrassed by any question of adequate
consideration) if the instruments had been deeds and con-
veyed a present interest in the lands. Parties must be held
to have comprehended the legal effect of the instruments they
have executed, and if there be no fraud, no misunderstanding

Fellows v. Heermans.

or misrepresentation of fact, no mutual mistake between the parties—a mere misconception of the law—as an abstract proposition, not entering as an ingredient into the transaction is not sufficient to confer a power of revocation, or to entitle the party who claims to be aggrieved, to relief. I think the law is very well settled upon this point, and has been very frequently adjudicated in terms that preclude any successful application for relief.

"Courts do not undertake to relieve parties from their acts and deeds, fairly done, on a full knowledge of the facts, though under a mistake of the law. Every man, at his peril, is to be charged with a knowledge of the law. There is no other principle which is safe and practicable in the common intercourse of mankind." (*Lyon* v. *Richmond*, 2 Johns., Ch. Rep., 60.)

When parties make just such instruments as they intend to make, and without fraud, surprise, undue influence or mistake of their rights, but labor under error as to the mere legal effect; that alone will not authorize a correction by this court. (*Storrs* v. *Barker*, 6 Johns., Ch. Rep., 166.)

"Courts of equity may grant relief against acts done, and contracts executed under mistake, or in ignorance of material *facts;* but it is otherwise, I think where a party wishes to avoid his act or deed, on the ground that he was ignorant of the *law.* All men are presumed to know the law of the land. And although the presumption may often be at variance with the fact, it is impossible, without indulging it, to maintain the order or the institutions of society." (BRONSON, J., in *Champlin* v. *Laytin*, 18 Wendell, 412.)

"EDMONDS, J. There are two reasons why I cannot grant to these plaintiffs the decree they seek, to set aside the whole of this trust deed. First. It was a voluntary conveyance on their part; and they seek to vacate it, not on the ground of a mistake as to matter of fact, but because they were ignorant what would be its legal effect and operation, and had made a mistake in a point of law. Now courts do not under-

take to relieve parties from their acts and deeds, fairly done, on a full knowledge of the facts, though under a mistake of the law. (*Lyon* v. *Richmond*, 2 John. Ch. R., 51; *Clark* v. *Dutcher*, 9 Cowen, 674; *Hunt* v. *Rausmanier*, 8 Wheat., 174; S. C., 1 Peters, 1.)" (*Dupre* v. *Thomson*, 4 Barb. Rep., 282. See, also, *Arthur* v. *Arthur*, 10 Barb. R., 9, 16; *Gilbert* v. *Gilbert*, 9 Barb., 532; *Stoddard* v. *Hart*, 23 N. Y., 556; *Leavitt* v. *Palmer*, 3 Comst., 38, 39; Story's Eq. Jur., §§ 111 to 116, 137, and note 138 a.)

Was the defendant in such a relation of trust and confidence to the plaintiff as called upon him to take the position of legal adviser and confidential friend, and inform him as to the legal effect of these conveyances?

As a matter of fact, the evidence does not show that he stood in that relation. He was simply a hired clerk, or servant, not having the general custody or charge of his business, but doing such work, and performing such services as he was from time to time called on to perform. The plaintiff took charge of his own business, and gave his instructions to the defendant; and although he occasionally sought his advice or opinion, it was, as a principal or superior often seeks, the suggestions or aid of his subordinate or clerk. The plaintiff was a lawyer; the defendant (so far as the case shows) was not. The plaintiff was skilled and practiced in the drawing of conveyances; and in cases where he had large responsibilities and interests, the defendant, so far as such business was concerned, was a mere draughtsman or copyist, performing useful services, doubtless, but in a subordinate capacity. The defendant was not called upon, I think, to volunteer his suggestions or advice, nor did the plaintiff rely upon him as his confidential adviser. For a long series of years he had relied upon his own mature and practiced judgment, and there is nothing to show that the defendant knew, or had reason to believe, that the plaintiff had any erroneous conception of the legal effect of these instruments. The plaintiff had drawn, or had procured to be drawn, quite a number of different instruments designed to be expressive of his intentions

as to the ultimate disposition of his property; and the
defendant, if he was called upon to form any opinion on the
subject, probably concluded that a subject which had occu-
pied so much of the plaintiff's thoughts, was pretty fully
comprehended by him.  Nor, notwithstanding what is said
and testified in the case, is it quite certain that the precise
and complete legal effect of these conveyances, in all their
immediate and remote bearings, was present to the mind of
the defendant, or even fully comprehended by him.  It was
by no means necessary to the validity of these papers that
their revocability should have been a subject of contempla-
tion or conversation.  And we may well doubt whether, if
the defendant had an opinion on the subject, and had expressed
it, the plaintiff would have placed any very high value upon
it, or rated it as superior to his own.  In short, the plaintiff
did not rely upon it, and did not expect any such communi-
cation; knew very well that he understood the subject
better than the defendant, and had not installed the defendant
into any such position as invited or led him to anticipate legal
or confidential communications from him.  There was not,
in my opinion, any such relation of trust and confidence as
demanded a professional opinion or confidential disclosures.

Nor, in my opinion, was there any undue influence or fraud
practiced by the defendant upon the plaintiff.  A certain
degree of influence was incident to the relation in which the
parties stood to each other, and was perfectly proper to be
exercised; and I do not think the evidence is sufficient to show
that it was abused.  The defendant obtained no larger share
of the plaintiff's property than others related to him in the
same degree of consanguinity; and it was certainly to be
expected that, in any disposition of his property which the
plaintiff might make, the defendant would naturally be per-
mitted to share largely, if not exclusively, in its management
and control.  It would have been strange, if the plaintiff com-
municated with him on that subject, that the defendant should
not have expressed his mind freely to him, and even sought
a private interview to have had fuller opportunity for the

unrestrained expression of his sentiments. I do not discover that he took undue advantage of his position, or that he misrepresented facts to the prejudice of the plaintiff or others. I do not see any sufficient evidence that his influence over the plaintiff was such as to enable him to substitute his own will or wishes for those of the plaintiff, or to override those of the latter, or that any such practical result was in fact produced.

I do not propose to go into any minute reference to the testimony on that subject. The case was heard at Special Term by a learned justice of this court, who himself heard the witnesses testify, and who was well qualified to give the proper weight to their testimony; and he has not only found against the existence of any such undue influence or fraud as is alleged, but has pronounced a very learned and able opinion on this whole case, which seems to make it almost a work of supererogation to write upon it further, and almost requires an apology for making the attempt to do so.

But the subject was so learnedly discussed in the arguments at General Term, and has not been viewed in precisely the same light by all of us who have to adjudicate upon the same, and the subject is withal so interesting in itself, and involves so large an amount of property, that I have, though with some hesitation, ventured upon its discussion.

I do not deem it necessary to discuss the exceptions to evidence. I think, in regard to them, that the rulings of the court below were either right or not prejudicial to the plaintiff to such a degree, or in any such sense, as to demand a new trial.

In reaching a conclusion in accordance with the opinion of the court below, and unfavorable to the relief which the plaintiff asks, I feel the less reluctance, because, if the affairs of the trust are properly and diligently administered, I see no reason to doubt that they may be so far advanced, and the property converted into money within a reasonable time, as to give to the plaintiff, and to place within his personal disposal, the avails of much the greater portion of his estate, and thus to enable him, independently of this trust, to dispose of the

Fellows v. Heermans.

same in entire accordance with his own wishes. This prac-
tical result is, I think, attainable, and, if attained, would
probably be a more sensible and beneficial disposition of this
controversy than to prosecute it through the courts for the
remainder of the plaintiff's life.

I am of opinion that the judgment of the Special Term
should be affirmed, with costs.

PARKER, J., concurred.

MILLER, J., dissenting.    This action was brought to set
aside certain instruments bearing date 10th and 15th October,
1868, and was tried at Steuben Special Term in June, 1869.

It appeared upon the trial that on the 3d day of October,
1868, the defendant having drawn, the plaintiff executed an
instrument of that date, employing terms of conveyance to
defendant all of plaintiff's estate, real and personal, in the
States of New York, Pennsylvania, Michigan, Wisconsin,
Indiana, Ohio, Illinois and West Virginia, in trust, to sell the
lands, &c., and pay over all proceeds and avails of the pro-
perty, real and personal, to the plaintiff during his life, and
after his death the residue (if any) to be distributed, as
directed, in writing, to be subscribed and executed by the
plaintiff; and in case writing was not executed, then the resi-
due to be distributed to the heirs of the plaintiff, according
to the laws of the State of New York.

On the 10th day of October, 1868, the defendant having
drawn another instrument as a substitute for that of the 3d
October, the plaintiff executed that, in which, in addition to
those in the previous one, were inserted provisions for renting
land until sold, and for compromising disputed and doubtful
claims, whereupon the first instrument was canceled.

On 15th October, the defendant having prepared a supple-
mentary instrument of that date, the plaintiff also executed
that, containing provisions simply for distribution after his
death of any residue there might then be.

At the time these papers were executed the plaintiff had
reached the age of eighty-seven years, and his property was

large, amounting to several hundred thousand dollars.  And
he then understood that he had, and would at any time there-
after, have the right and power to revoke and terminate all
the authority vested by those instruments in the defendant,
and render them entirely inoperative.  He testified on that
subject : That his expectation and intention was that he could
resume the entire control of the property whenever he chose
to do it.  That he understood that he could do it by revoca-
tion.  He would not have made these papers if he had been
advised that he had not the power to revoke them.  His
opinion was that he had full power to revoke them at any
time ; also that he did not intend to give defendant the entire
control and management of his property.  He expected that
whatever was done would be done with his privity and con-
sent.  And the court found the fact that when he executed
the papers the plaintiff entertained the idea and belief that
he could revoke.

It appeared that up to the time at which the papers were
executed and for several years previous the defendant (who was
his nephew) had been engaged for the plaintiff in his office as
clerk, having charge of his books, and was with the plaintiff
daily aiding him generally, and had acquired the confidence
of the latter.  That for the purpose of procuring the plain-
tiff's promise to make the papers, and the execution of them,
the defendant induced the plaintiff to leave his own house and
office, and go to the dwelling of the defendant on the 29th day
of September.  The defendant testifies that he invited him
there for the purpose of consulting with him on this subject,
and wanted a private interview because he wanted him to fix
something.  That when he took him to his house he contem-
plated having a paper executed for the purpose of getting
control of the property if he would do it.  And defendant
added that he did not want to undertake his purpose in any
room at the house or office of the plaintiff, because somebody
would be sure to bolt in, and he didn't want anybody to hear.
He was not afraid of everybody in general, but of somebody
in particular, and of one Joseph F. Hill.  Hill was not

about there; that he was not afraid of him, but the danger was apprehended from the sister of plaintiff who had lived with and kept house for him over twenty years. The defendant's brother, Edmonds, of Scranton, Pennsylvania, appeared there on business at just about that time, who says that he was consulted by the plaintiff on the subject. The defendant also trusted his son George with the secret, and therefore took the plaintiff from his house to the foundry and machine shop of his son George (with whom one Preston was a partner) to have the papers of 10th and 15th October executed and witnessed.

Immediately after the interview on the 29th September, the defendant prepared a paper of that date, as he says, pursuant to the arrangement, and the plaintiff refused to execute, and repudiated it. A will was also drawn, which appears in the handwriting of the defendant of date of 30th September, which was also witnessed by the said George and his partner Preston, and the defendant testified that it was made as a temporary instrument, and he kept it. The defendant continued to draw papers for the plaintiff to execute, and the latter not being satisfied, prepared and executed a will on the 2d day of October, 1868. But, in the meantime, the defendant had drawn up a paper which the plaintiff reduced to a will by alterations.

Immediately after the papers of the 10th and 15th October were made, the defendant caused them to be recorded without the consent of the plaintiff, who made that a subject of complaint as soon as it came to his knowledge. And not long after this the defendant claimed the right to assume control and management of the property and business in defiance of the plaintiff. And thereupon the plaintiff distinctly declared his right to revoke and terminate, and did revoke all the power of the defendant under the instruments, and claimed to resume the entire and exclusive control and management of his property and business.

The court at Special Term concluded :

1. That the plaintiff's misapprehension respecting the instruments in question, related to their legal effect; and, therefore, no relief from the consequences, however serious, could be afforded on that account.

2. That the instrument was made without undue influence or fraud.

3. That the relation between the parties was that of master and servant.

4. That the instrument of the 10th October, 1868, created a valid trust.

5. That the instrument of 15th October, 1868, also created a valid trust.

A judgment was entered upon the decision, and the plaintiff appealed.

One of the principal questions to be determined in this case is, whether the instrument executed by the plaintiff to the defendant, bearing date the 10th day of October, 1868, created a valid trust, within the provisions of the Revised Statutes in regard to uses and trusts. They are abolished, except as authorized and modified by the statute. (1 R. S., 727, §45.) According to the statute, express trusts may be created for certain purposes therein named, and, among other purposes, "to receive the rents and profits of lands, and apply them to the use of any person, during the life of such person, or for any shorter time, subject to the rules prescribed in the first article of this title." (1 R. S., 728, § 55, subd. 3.) The instrument in question provides for a sale and conveyance of the lands by warranty deeds, and, until they are sold, authorizes the defendant to rent such of them as can be rented for the best prices which can be obtained. The whole avails are then to be distributed, after deducting commissions, by paying over the same to the plaintiff, or under his direction.

It is evident that the main object to be accomplished by the instrument was to sell the real estate and pay over the avails, and the renting of the property was merely incidental and collateral to that object. It simply provided for its use while waiting for a sale, and for the disposition of

Fellows *v.* Heermans.

such sums as might be realized from rents during that period.

Pending the negotiations for a sale, and while engaged in disposing of so large an amount of property, some portion of it would necessarily lie idle, and, therefore, as a financial matter, dictated by sound judgment, the provision appears to have been made for the renting of those portions which could thus be disposed of, until a sale was had. Upon a fair interpretation of the statute, it would seem to be quite apparent that such a renting of property as is thereby authorized was not contemplated by the instrument, for it makes no provision for the receiving of the rents and profits, and the application thereof for the use of the plaintiff for life or a shorter term, as the statute requires in order to create a trust. The object of the instrument was to sell, and not to rent, the property; to pay over the avails of sales and all moneys received, and not to apply them to the use of the plaintiff. This construction of the instrument is supported by the principles laid down in numerous adjudicated cases. (*Wright* v. *Delafield*, 23 Barb., 516 ; *Hotchkiss* v. *Elting*, 36 id., 44; *Downing* v. *Marshall*, 23 N. Y., 379.) If no trust was created under section 55, then no title vested in the trustee. (1 R. S., 729, § 60.)

Another, and, in my opinion, a strong and unanswerable ground for holding that no trust was created within the third subdivision of section 55 before cited is, that, when such is the case, although title is vested in the trustee for the purposes named, the power of alienation is suspended, and every sale or conveyance is absolutely null and void. (1 R. S., 730, § 65; *Boynton* v. *Hoyt*, 1 Denio, 53; *Cruger* v. *Jones*, 18 Barb., 471 ; *Hawley* v. *James*, 16 Wend., 164; *Coster* v. *Lorillard*, 14 Wend., 303.) In the instrument of the 10th of October, unlimited authority is given to sell and convey the property, and there is no restraint whatever upon the alienation thereof at any time or under any circumstances. The power of sale is in no respect restricted by the direction to rent, but entirely independent of it. The duty to sell is

absolute and imperative, and the plaintiff could compel its execution if there was a valid and lawful power to sell. (1 R. S., 734, § 96; *Hotchkiss* v. *Elting*, 36 Barb., 46; *Arnold* v. *Gilbert*, 5 id., 190.)

No one but the plaintiff is interested in the price to be obtained. The parties named in the instrument of October 15th are not in any event entitled to any property except such as may remain in the hands of the trustee after the death of the plaintiff. They have no interest in the sales or collections, and no equitable rights to obstruct or delay them for any purpose.

It is said that the power to sell was not inconsistent with the trust to receive the rents and profits, and apply them to the use of any person who was entitled to the same. Conceding that this position may be a sound one, where the power to sell is incidental to the receipt of the rents and profits and their application; yet when the sale is the main object of the trust designed to be established, and this is evident from the instrument itself, I think that the rule contended for has no application, and is in conflict with the principle established by the authorities to which I have before referred.

In support of the doctrine contended for, the learned judge before whom the case was tried cites the case of *Belmont* v. *O'Brien* (12 N. Y., 394), which case, it is insisted by the counsel for the defendant, overrules any authorities cited by the plaintiff which can be regarded as holding that a trust estate is inconsistent with an ultimate power of sale, and thereby rendered invalid.

In the case last cited, it was held that where, in contemplation of marriage, lands were conveyed to trustees, to receive the rents and profits and apply them to the separate use of the wife during life, and the trust deed contained a power to the trustees to sell the lands and reinvest the proceeds, and hold them so reinvested to the same use, that the power was valid, and that a conveyance by the trustees passed a good title. The opinion of the court cites the case of *Haw-*

*ley* v. *James* (5 Paige, 444, 445), where the chancellor held that the mere exchange of one piece of property for another by a trustee under a valid power in trust is not considered as an alienation of the estate, and it was not important whether the exchange was made directly or by means of a sale or a new purchase, and that this was not a power of alienation, within the intent and meaning of the Revised Statutes on the subject. The decision of the case is also put upon the ground that the trust created was an *ante-nuptial agreement;* and as powers of sale and exchange have been considered usual and proper in *marriage settlements,* if the sale was simply an alienation, it was not prohibited by sections 63 or 65 of the statutes in regard to uses and trusts.

It will be seen that the case cited is entirely different from the one at bar. The power to sell was incident to the main object of the trust created, which was to receive the rents and profits, and apply the avails; while here the renting of the property is incident to the main object, which was the sale and disposition of the avails. Nor is there anything in the instrument executed by the plaintiff which presents an exceptional case, similar to an ante-nuptial agreement which prevents the application of the statute prohibiting a sale in cases of trusts under the third subdivision of section 55. I cannot, therefore, consider this case as establishing any new doctrine in conflict with the cases before cited.

The other cases relied upon do not sustain the doctrine contended for. In *The Matter of the Petition of Livingston* (34 N. Y., 555), it was held that where the rents and profits of the real estate were, by the terms of the trust, to be paid over to the grantor or creator of the trust himself, the trust was valid, and that so far as the deed requires the trustee to assign and convey the legal estate to those entitled to the remainder, his services would be useless; as the transfer would be made, if at all, by operation of the statute of uses, and his office of trustee would then cease. There is nothing in this case which sustains the position that a trust to receive

the rents and profits and apply the same, with a power of sale, is valid.

In *Wright* v. *Miller* (4 Seld., 9), the trust deed was made in 1809, and the Revised Statutes have no application to it. No question of trust under the statute was presented. It may also be remarked that the power of sale conferred by the deed was consistent with and incidental to the trust, as it provided for the payment of so much as was necessary for the support of the *cestui que trust* and the accumulation of the surplus for the purposes of the trust.

There is no reported case which goes to the extent of holding that where the principal object of the trust is to sell lands and pay over the avails, the authority to rent in the mean time can take the case out of the statute. If such was the law, then the statute might be easily evaded, and its purpose entirely set at naught. The true question is, what was the main and principal object of the trust? If to sell lands and pay over the proceeds, then clearly it is not within the statute. It is no answer, in my opinion, to the invalidity of the authority to sell lands and pay over the avails, that a further and subordinate purpose, which was valid, is added, to carry out the main object. The two purposes are not in conformity with the spirit of the statute, and the subordinate one must yield to the greater, and be considered as merely auxiliary to it. I think it cannot be maintained, upon any sound principle, that an instrument authorizing a sale of lands in express violation of the statute of uses and trusts is saved from the operation of the statute, because, until the lands are sold, authority is given to rent the same. It is plain that the statute never was intended to confer any such authority, and would be of no practical utility if it could be thus perverted from its purpose. If the real object of the instrument in question was to create a trust for the sale of real estate and the payment of the avails arising therefrom, then the clause which provides for the renting of the premises until sold is a mere appendage attached to it for the purpose of carrying into effect the principal object in view. It cannot save the

Fellows *v.* Heermans.

invalidity of the conveyance, or render it effective in any way. It is entirely different from a trust created to receive the rents and profits and pay over the avails where a power to exchange lands is granted, as incidental to the main object. (5 Paige, 444, 445.) As was said by WALWORTH, Chancellor, in the case last cited, "The rules of law on the subject of rendering estates inalienable have reference to the substance and not merely the shadow. And for any substantial purpose the land received in exchange for that of which the testator died seized can be considered in no other light than the same estate." The "substance" in the case cited was the receipt of the rents, and their appropriation, while here it is the sale of the property and the payment of the avails. If the instrument of the 10th of October did not create a trust, then the instrument bearing date the 15th day of October, 1868, which was executed to carry out the purpose of the first instrument, is of no avail, and both of them must be set aside.

No valid trust being created under the Revised Statutes, the question arises whether a power in trust is not created under section 58, of the title referred to, which provides: "When an express trust shall be created for any purpose not enumerated in the preceding sections, no estate shall vest in the trustees; but the trust, if directing or authorizing the performance of any act which may be lawfully performed under a power, shall be valid as a power in trust, subject to the provisions in relation to such powers contained in the third article of this title. (1 R. S., 729.) The next section (59) declares that when the trust is valid, as a power, the lands to which it relates shall remain in or descend to the persons otherwise entitled, subject to the execution of the trust as a power. By the third article of the Revised Statutes referred to, powers are abolished, as they then existed (1 R. S., 732, § 73), and certain kind of powers were authorized. These were general or special, and beneficial, or in trust. (§ 76.) A power is general when there is a general authority to convey, in fee, to any alience. (§ 77.) Special powers are limited to persons designated, and any alienation authorized of an estate

or interest less than a fee. (§ 78.) It is beneficial when no other person but the grantee has an interest in the execution (§ 79.)

A general power is in trust when any other person than the grantee has an interest in the proceeds, or the benefits to be derived from it. (§ 94.) Under these provisions, if any power was created by the instrument it was a general power. The statute also provides in what manner a power may be created, and that it may be granted : " 1. By a suitable clause contained in a conveyance of some estate in the lands to which the power relates. 2. By a devise contained in a last will and testament." This provision excludes all other methods of creating a power; and as the instrument in question, as we have seen, conveys no estate, and it is still vested in the grantor, it does not contain the requisites of a power in trust.

A power in trust is defined to be a mere authority, or right, to limit a use. (*F. L. and T. Co.* v. *Carroll*, 5 Barb., 652. *Sterricker*, v. *Dickinson*, 9 Barb., 519.) In case of a power in trust, the beneficiary must be some person besides the grantor. There must be some third person besides the devisee or grantee of the power, who is called the appointee. The parties concerned in creating a power in trust, are the *donor* who confers the power, the *appointee* or *donee* who executed it, and the appointee or person in whose power it is executed. (4 Kent, 316.) The grantor is not a third person who has an interest in the performance of the stipulations and provisions of the agreement. (5 Barb., 653.)

An appointee is wanting to constitute a power in trust, unless the *donor* or *grantee* can be considered as such, which is in conflict with the rules laid down in the cases cited. It may also be observed that the appointee, under the power, derives his title from the instrument by which the power of appointment was created; and the statute expressly provides that no person can take under an appointment, who would not have been capable of taking, under the instrument by which the power was granted. (1 R. S., 737, § 129 ; 4 Kent,

Com., 327, 328.)  In *Dempsey* v. *Tylee* (3 Duer., 73, 98), this provision of the statute was held to apply to estates which may be lawfully created, when the appointee of a power is incompetent to take by deed directly from the person creating or reserving the power.  The appointee here is the grantee ; and as he could not convey to himself, and was incompetent to take, by deed, from himself, it follows that he could not be the appointee.

If it be conceded that a trust may be created by a grantor for his own benefit, yet the doctrine that the grantor of a power in trust may be himself the appointee or beneficiary, cannot be sustained either upon principle or authority.  In *Wright* v. *Delafield* (23 Barb., 498), which is cited by the defendant's counsel to sustain a different principle, the judgment of the Supreme Court was reversed by the Court of Appeals ; and the point now considered was not material in the decision of the case.  So far as the opinion of the Supreme Court can be considered as upholding the doctrine contended· for by the defendant's counsel, it is decidedly adverse to the general current of authority, and in conflict with the principles of law applicable to powers.

The instrument of October 10th being insufficient to create a power in trust, because it failed to designate an appointee, and being invalid of itself, the deficiency is not supplied by the provision for the distribution to be made after the decease of the plaintiff; and the instrument, executed on the 15th of October, which designated the persons to whom the property was to be distributed after the decease of the plaintiff.

As it was originally invalid and void on its face, it could not, I think, be resuscitated and rendered effective by the instrument subsequently executed, even if that had been legal and valid.

It is said that a valid trust was created in respect to the personal estate, which constitutes the largest portion of the property of the plaintiff.  It is held that statutes in regard to trusts, except as to the limitation of future or contingent interests, relate to real estate only ; and that trusts in respect

to personal property are now allowable as before, as no pro-hibition or restriction is imposed by the statute, except as above stated. (*Brown* v. *Harris*, 25 Barb., 135; *Kane* v. *Gott*, 24 Wend., 641; *De Peyster* v. *Clendenning*, 8 Paige, 295; *Gott* v. *Cook*, 7 id., 521.) This is, no doubt, the rule where a trust is created which is complete of itself, and can be carried into effect. It must, however, be such a trust as is capable of being enforced. Such is not the case here. The instrument in question provides, as to the personal property, that the debts shall be collected, and that the avails of both real and personal property shall be paid and distributed as pro-vided. It will be observed that no provision is made for the col-lection of the principal of any security held by the plaintiff, or of any interest thereon, or of any dividends on stock, or for a reinvestment of money, where a security is paid, or for the assignment of the same if necessary, as required by circum-stances which might thereafter arise. Nor is any power given for the sale of any stocks or securities, where, in the exercise of a sound judgment in the management of the estate, it might be absolutely necessary. In the changes and fluctua-tions of financial matters, and to save from depreciation and loss, it might be of great importance to the security and safety of stocks and other investments to sell and dispose of the same in the market. According to the terms of this instrument, the defendant would have been utterly powerless to make a sale, and thus save the estate from severe pecuniary losses. He must stand by and witness, perhaps, the entire sacrifice of the security, with no authority whatever to remedy the difficulty, which never could have been intended. So far as the personal estate is concerned, the instrument is destitute of the requisite elements to create a trust, and confers no suffi-cient authority for any such purpose. To constitute a valid trust, there must be not only adequate power to hold the pro-perty, but authority to dispose of the same for the benefit of the *cestui que trust*, and to carry out the purposes intended. In this respect, the instrument was entirely defective, and cannot stand as a trust of the personal estate. The authority to col-

tect debts owing the plaintiff was, at most, a power of attorney as to this portion of the personal property, and upon no sound principles can be construed into anything beyond this. The instrument was neither a trust nor a power in trust, as to the real or personal property, but a simple power of attorney, which could be revoked at the pleasure of the plaintiff. He so understood it at the time of its execution, as the judge has found; and, upon the execution of the revocation by the plaintiff of both the instruments executed by him, they were annulled, and the property granted became restored to him, the same as if they had never been made.

Although the instruments executed by the plaintiff are null and void for the reasons already stated, there is, I think, another ground which is fatal to their validity. At the time of the execution of these papers, the defendant occupied a position of trust and confidence with the plaintiff, in reference to the subject-matter of the transaction, which obligated him to impart proper advice and information as to the plaintiff's rights, and the legal effect of the instruments which were executed. The defendant had been employed as plaintiff's clerk and assistant in his business for a number of years, occupying the office of the plaintiff, with him at his residence, and in the habit of daily intercourse with the plaintiff. He was a favorite nephew and confidential friend and adviser, in whose integrity, honesty and fairness, the plaintiff had the most implicit confidence. The plaintiff confided to him the execution of the power conferred, and he was largely interested in the profits arising from the employment, furnished by the papers executed, as well as in the residuary portion of the defendant's estate. According to the defendant's own version of the manner in which the transaction was accomplished, he apprehended that another relative might interfere with him; and if this person was tolerated in the office, he states that he knew that it would be so uncomfortable for him that he would not stay, and he invited the defendant to his house for the purpose of consulting with him on the subject, intending, at the time, to have a paper executed that would give him the

control of the property, and put him in a position which would be permanent. He avoided the plaintiff's house because he was apprehensive that some one might come in, and particularly the sister of the plaintiff, who had lived with and kept house for him for a period of twenty years. Thus secretly, and where he was not likely to be interrupted, he made a proposition that the plaintiff make a conveyance to him, in trust, which was assented to. The defendant prepared a deed accordingly, which was examined and altered, but was not executed. The plaintiff then prepared and executed a will. Another paper was drawn, which was altered to a will, but not executed. Then followed the instrument of October 3d, which was executed and abandoned; and, at last, the papers in question were executed.

From this brief history of the proceedings, prior to the execution of these instruments, it is apparent that the defendant was a prominent actor in the transaction. He instigated and procured the private interview, advised what should be done; either drew or advised as to the drawing of all of the papers; and those which were executed are in his handwriting. He acted, throughout, as the confidential adviser and attorney, and not as a mere agent of the plaintiff, to carry out his views. The plaintiff was in the decline of life, being eighty-six years of age, pressed with bodily infirmities, with his sight, memory, and hearing impaired, although of great intelligence for a man who had passed so far beyond the allotted period of human life. He entertained the idea, as the court has found, that he was merely conferring upon the defendant a power of attorney, revocable at his pleasure, and thus the sales of his property might be continued until he choose to change it. He testifies that he had confidence in defendant's integrity and skill in business, and it is apparent that he trusted him, not only as a friend and relative, but as his legal adviser.

Under such circumstances, the defendant having assumed the responsibility of procuring the plaintiff to execute the papers, he was bound to know, and to advise the plaintiff,

as to their legal operation. and effect, and that, thereafter, to a large extent, the property would be beyond his control, if such was the fact.

The courts regard, with jealousy, all transactions which involve confidential relationship and the dependence of one party upon another. They seek to protect the weak and infirm, the aged and helpless, who, intrusting confidence, rely upon the advice and assistance of others, from all improper influence which they may possibly exercise, over the acts and conduct of these persons in the disposition of their property. It does not allow an individual to take advantage of confidence reposed in him, either in professional or friendly relations.

A court of equity will exercise its jurisdiction to set aside instruments executed between parties, where one party is so related as to exercise a controlling influence over the conduct, will and interests of another. The nature of the transaction itself is often such, that undue influence may be inferred. In other cases it appears from the transaction, and the exercise of occasional or habitual influence. The authorities which uphold this principle are abundant. In *Newton* v. *Atkyns* (3 M. & K., 140), it was held that when the relation is only that of friendly habits or habitual reliance on advice and assistance, accompanied with partial employment in doing some sort of business, care must be taken that no advantage be had of the influence thus acquired.

In *Huguein* v. *Baseley* (14 Vesey, Jr., 273), a voluntary settlement by a widow upon a clergyman and his family was set aside as obtained by undue influence and undue confidence in the defendant. The lord chancellor, ELDON, says: "If the proposition (to execute her purpose) was her own, yet the transaction, in a court of justice, has this character, at least, that it was a demonstration to Baseley that she placed confidence in him as high as one individual ever placed in another." He further remarks: "And the language of a court of justice has at all times been, that, if a man does not choose to act upon the confidence, appearing in the course of the

transaction, to be so reposed in him, he ought to reject it as soon as proposed." In this case the court also held, that, even although the defendant and his attorney, who were instrumental in procuring the deeds of settlement, did not communicate that knowledge of their effect, nature and consequences which they were bound by their duty to do, before she was suffered to execute them, because they were not aware of the duties which the court required of them in the situation in which they stood, yet, when the decision rests upon the ground of public policy and utility, for the purpose of maintaining the principle, it is necessary to impute knowledge which the party may not have actually had. (See, also, *Pickering* v. *Pickering*, 2 Beavan, 31; *Lady Ormond* v. *Hutchinson*, 13 Vesey Jr., 53; *Willan* v. *Willan*, 16 id., 72; *Purdy* v. *Disbourrie*, 3 P. W., 315; *Sears* v. *Shafer*, 2 Seld., 268–272; *Crispell* v. *Dubois*, 4 Barb., 393.; Story Eq. Jur., §§ 307, 308; Jeremy's Eq. Jur., 395, 396; Willard's Eq. Jur., 169; Tiff. & Bull on Trusts, 153.)

The authorities are uniform in their tendency, and lead to the irresistible conclusion that the instruments in question cannot be upheld. I have examined the cases cited by the defendant's counsel which are supposed to sustain a different doctrine; but I think that none of them are in conflict with those to which I have referred.

Some other questions are raised by the plaintiff's counsel; but, as those already discussed dispose of the case, it is not necessary to discuss them.

After a careful examination I am satisfied that the instruments in question cannot be sustained upon any of the grounds taken by the counsel for the defendant, and the judgment must be reversed, with costs.

As the defendant is not entitled to judgment under any state of facts applicable to the case, I think that judgment should be ordered in favor of the plaintiff, in accordance with the prayer of the plaintiff's complaint.

Judgment affirmed.